## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| Malikie Innovations Ltd. and | § | |
| Key Patent Innovations Ltd., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| Brother Industries, Ltd. and Brother | § | JURY TRIAL DEMANDED |
| Industries (U.S.A.), Inc., | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT FOR PATENT INFRINGEMENT AND JURY DEMAND

Plaintiffs Malikie Innovations Ltd. ("Malikie") and Key Patent Innovations Ltd. ("KPI") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Complaint for patent infringement and damages against Defendants Brother Industries, Ltd. ("Brother Industries") and Brother Industries (U.S.A), Inc. (Brother USA), (collectively, "Brother" or "Defendants") and, in support, allege the following:

### PARTIES

1. Plaintiff Malikie is the successor-in-interest to a substantial patent portfolio created and procured over many years by BlackBerry Ltd., formerly known as Research in Motion Ltd., and its predecessor, subsidiary, and affiliated companies (collectively, "BlackBerry"). Malikie is an Irish entity duly organized and existing under the laws of Ireland. Malikie has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

2. Plaintiff KPI is the beneficiary of a trust pursuant to which Malikie owns, holds, and asserts the Asserted Patents (set forth below). KPI is an Irish entity duly organized and existing

under the laws of Ireland.  KPI has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

3.      On information and belief, Defendant Brother Industries, Ltd. is a corporation duly organized and existing under the laws of Japan with its principal place of business located at 15-1, Naeshiro-cho, Mizuho-ku Nagoya-shi, Aichi-ken, Japan 467-8561.

4.      On information and belief, Defendant Brother Industries (U.S.A), Inc. is a corporation duly organized and existing under the laws of Delaware, with a principal place of business at 7819 North Brother Boulevard, Bartlett, Tennessee, 38133.  Defendant has a registered agent at Corporation Service Company, 2908 Poston Ave., Nashville, Tennessee 37209-1312. Brother Industries (U.S.A.), Inc. is a wholly-owned subsidiary of Brother Industries, Ltd.

5.      On information and belief, Defendants and/or their employees or officers direct and/or control the actions of their direct and indirect subsidiaries.  On information and belief, Defendants and/or their employees or officers direct and/or control the actions of these entities by, for example, inducing and contributing to the actions complained of herein.  Brother and its affiliates are part of the same corporate structure and distribution chain for the making, importing, offering to sell, selling, and/or using of the infringing devices in the United States, including in the State of Tennessee generally and this judicial district in particular.

6.      Brother and its affiliates share the same management, common ownership, advertising platforms, facilities, distribution chains and platforms, and infringing product lines and products involving related technologies.

7.      Brother and its affiliates regularly contract with customers regarding products made for or on behalf of those customers.

2

8.     Brother and its affiliates operate as a unitary business venture and are jointly and severally liable for the acts of patent infringement alleged herein.

## PATENTS IN SUIT

9.     Malikie is the assignee of and owns all right and title to U.S. Patent Nos. U.S. Patent Nos. 9,143,323 (the "'323 Patent"); 7,747,934 (the "'934 Patent"); 8,334,847 (the "'847 Patent"); and 9,942,316 (the "'316 Patent) (collectively, the "Asserted Patents").

10.     BlackBerry developed numerous innovative and diverse technologies, including groundbreaking inventions pertaining to mobile devices and related software and wireless communications technology.  Some of these groundbreaking inventions are described and claimed in certain of the Asserted Patents.

11.     The '323 Patent, entitled "Securing a Link Between Two Devices" was duly and lawfully issued on September 22, 2015. A true and correct copy of the '323 Patent is attached hereto as Exhibit 1.

12.     The '934 Patent, entitled "Method for Selecting Low Density Parity Check (LDPC) Code Used for Encoding of Variable Length Data" was duly and lawfully issued on June 29, 2010. A true and correct copy of the '934 Patent is attached hereto as Exhibit 2.

13.     The '847 Patent, entitled "System Having User Interface Using Object Selection and Gestures" was duly and lawfully issued on December 18, 2012. A true and correct copy of the '847 Patent is attached hereto as Exhibit 3.

14.     The '316 Patent, entitled "Persistent Network Negotiation for Peer to Peer Devices" was duly and lawfully issued on April 10, 2018. A true and correct copy of the '316 Patent is attached hereto as Exhibit 4.

15.    Malikie sent Brother a letter (addressed to Brother Industries' Representative Director and President, Mr. Ichiro Sasaki and Brother USA's President, Don Cummins), dated April 12, 2024, offering a license to Malikie's patent portfolio.  Malikie's letter included the '316 Patent and identified exemplary products or services that Malikie believes infringe that patent. Malikie's letter also stated that its portfolio included patents relating to the Wi-Fi 802.11 and Wi-Fi Alliance standards and that Malikie is willing to offer Brother a license so that it could continue its use of the patented technologies.  Takaaki Kumeno, a member of the Intellectual Property Department of Brother Industries confirmed Brother's receipt of the April 12, 2024 letter via email.

16.    Malikie followed up with Mr. Kumeno with an email dated May 17, 2024.  The May 17, 2024 email provided claim charts including evidence of Brother's infringement of the '316 Patent. The May 17, 2024 email included an invitation to discuss Malikie's patent portfolio and possible licensing terms.  Malikie received a receipt indicating that the May 17, 2024 email was received by Mr. Takaaki Kumeno. Malikie followed up on or about August 9, 2024, August 23, 2024, September 4, 2024, September 30, 2024, October 7, 2024, and December 18, 2024. Malikie's September 4, 2024 correspondence identified a rate at which Brother could license its standards-essential patents (SEPs). On or about each of August 7, 2024, August 9, 2024, September 4, 2024, and October 7, 2024, Brother indicated that it and its suppliers were reviewing the patents and information Malikie provided, including evidence of infringement. On or about December 23, 2024, Brother identified questions regarding the evidence of infringement.

17.    Malikie followed up with Brother to address Brother's questions on or about January 14, 2025. On or about January 31, 2025, Brother requested additional evidence of infringement.  From February 3, 2025 through March 25, 205, Malikie and Brother negotiated a non-disclosure agreement (NDA) to facilitate licensing discussions.

18.    On or about March 26, 2025, Malikie provided additional evidence of infringement. Malikie followed up with Brother on or about April 1, 2025 and indicated that it would be available for an in-person meeting in mid-May.  Brother responded on or about April 7, 2025, indicating that it was reviewing the additional evidence of infringement. On or about April 10, 2025, April 16, 2025, April 22, 2025, April 28, 2025, May 2, 2025, and May 9, 2025, Malikie and Brother coordinated to conduct an in-person meeting to be held on May 12, 2025. In Malikie's May 2, 2025 correspondence, Malike provided a presentation to be discussed in the May 12, 2025 meeting. Malikie and Brother conducted an in-person meeting on May 12, 2025 at Brother's Mizuho Factory, 1-1-1, Kawagishi, Mizuho-ku, Nagoya, Aichi 467-8562, Japan.  Malikie followed up with an email on May 12, 2025 and again on May 15, 2025. The May 15, 2025 correspondence identified additional evidence of infringement.

19.    Subsequently, Malikie followed up with Brother on June 12, 2025 and June 20, 2025, and July 3, 2025. On or about July 3, 2025, Brother responded indicating it was continuing its review. Malikie continued to follow up on or about July 8, 2025, and Brother responded on or about July 11, 2025, indicating that it was still reviewing. Malikie followed up again on July 31, 2025 and August 19, 2025. On or about August 28, 2025, Brother provided a response on certain infringement evidence, and Malikie responded on September 8, 2025 addressing Brother's issues. Malikie further identified the '934 Patent and exemplary Brother products or services that infringe it.  Malikie's September 8, 2025 correspondence reiterated the rate at which Brother could license its standards-essential patents.

20.    On or about September 22, 2025, Brother identified additional questions regarding the evidence of infringement. On or about September 24, 2025 Malikie addressed Brother's questions. Brother identified additional questions on or about September 29, 2025 and on or about

September 30, 2025 Malikie and Brother conducted a virtual meeting. Malikie followed up after the meeting, on or about September 30, 2025, to address any question raised by Brother during the meeting. Malikie followed up again on or about October 16, 2025 and identified the '323 Patent and exemplary Brother products or services were or are infringing it.

21.     Malikie and Brother conducted an in-person meeting on March 10, 2026 in Japan. During the meeting, Malikie presented a slide deck that summarized Malikie's patent portfolio and identified additional patents, including the '847 Patent, and exemplary Brother products or services that Malikie believed were and/or are infringing these patents (on a patent-by-patent basis).

22.     Despite Malikie's numerous attempts to discuss licensing terms with Brother, Brother has not consented to a license. And despite having been offered a Fair, Reasonable, and Non-Discriminatory ("FRAND") rate at which to license Malikie's SEPs, Brother has effectively refused Malikie's rate and has never provided an alternate rate that it believes is FRAND. Malikie has therefore been left with no choice but to bring this action to enforce its rights as the owner of valid and valuable patents that Brother is willfully infringing.

## WI-FI STANDARD AND PLAINTIFF'S FRAND OBLIGATIONS

23.     The Institute of Electrical and Electronics Engineers ("IEEE") is a professional association whose activities span a broad range of disciplines, including telecommunications. As part of its activities, the IEEE develops and publishes industrial standards, including standards pertaining to wireless communications.

24.     The IEEE-Standards Association (SA) operates within the IEEE and develops global standards in various industries, including Wi-Fi (802.11) standards. The IEEE 802.11 standards, developed by the IEEE-SA, provide a set of medium access control (MAC) and physical layer (PHY) specifications for implementing Wi-Fi. The IEEE-SA requires participants to commit

6

to abiding by their Intellectual Property Rights ("IPR") policies, which set forth the rights and obligations of their members. For example, members are required to disclose intellectual property rights that disclose standard essential and potentially standard essential patents and patent applications relevant to IEEE standards. Further, the IEEE requires members disclosing IPR to indicate, via a Letter of Assurance ("LOA"), whether they will commit to granting implementer members a license under terms that are Fair, Reasonable, and Non-Discriminatory ("FRAND").

25.    BlackBerry has been an active participant in the IEEE's development of industry standards, including many of the 802.11 standards. On numerous occasions, BlackBerry notified the IEEE in public LOAs that its patents could include Essential Patent Claims with respect to at least the IEEE 802.11-2102, 802.11k, 802.11mb, 802.11n, 802.11p, 802.11r, 802.11s, 802.11u, 802.11v, 802.11w, 802.11y, 802.11z, 802.11aa, 802.11ad, 802.11ae, and 802.11.2 standards. BlackBerry further indicated that it will grant a license to patents that could include Essential Patent Claims under terms that are FRAND.

26.    Furthermore, Wi-Fi Alliance develops additional specifications on top of the IEEE 802.11 standards, including Wi-Fi Direct. BlackBerry has been an active member of Wi-Fi Alliance and an active participant in developing the Wi-Fi Direct specification.

27.    The IEEE Patent Policy and FRAND framework make clear that FRAND negotiations require a reciprocal duty of the SEP holder and licensee to engage in good faith negotiations without unreasonable delay, or alternatively, litigate. Section 6.2 of the current IEEE bylaws states:

> The Submitter and the Applicant should engage in good faith negotiations (if sought
> by either party) without unreasonable delay or may litigate … over patent validity,
> enforceability, essentiality, or infringement; Reasonable Rates or other licensing

terms and conditions; compensation for unpaid past royalties or a future royalty rate… § 6.2.

28.     As mentioned above, Malikie offered Brother the chance to license its SEPs, including those covering IEEE 802.11 and Wi-Fi Direct standards, on Fair, Reasonable, and Non-Discriminatory ("FRAND") terms. Malikie has notified Brother of infringement of its SEPs since at least 2024. Particularly, Malikie notified Brother of its infringement of the '316 Patent on April 12, 2024 and the '934 Patent on September 8, 2025. On or about September 4, 2024, Malikie offered a specific FRAND royalty rate for all patents essential to the IEEE 802.11 and/or standards set by Wi-Fi Alliance. As detailed above, Malikie has shared evidence of Brother's infringement of Malikie's SEPs and discussed licensing proposals with Brother from April 12, 2024 to March 10, 2026. More than eighteen months have passed since Malikie's first FRAND offer. Yet Brother has not accepted Malikie's proposed rate or even counteroffered with a rate that it believes is FRAND.

## JURISDICTION AND VENUE

29.     Plaintiffs incorporate by reference paragraphs 1-28 herein.

30.     This civil action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including without limitation 35 U.S.C. §§ 271, 281, 283, 284, and 285.  Thus, this is a patent infringement lawsuit over which this Court has subject matter jurisdiction under, *inter alia*, 28 U.S.C. §§ 1331, 1332, and 1338(a).

31.     This District has general and specific personal jurisdiction over Defendants because, directly or through intermediaries, Defendants have committed acts within this District giving rise to this action; transact and conduct business, directly, and/or indirectly, in this District

and the State of Tennessee; and transact and conduct business with residents of this District and the State of Tennessee.

32.    Defendants have infringed and continue to infringe the Asserted Patents within this District and the State of Tennessee by making, using, selling, licensing, offering for sale, and/or importing in or into this District and elsewhere in the State of Tennessee, products and services covered by claims in the Asserted Patents, including without limitation products that, when made or used, practice the claimed methods of the Asserted Patents. Defendants, directly and through intermediaries, make, use, sell, license, offer for sale, import, ship, distribute, advertise, promote, and/or otherwise commercialize such infringing products and services in or into this District and the State of Tennessee.  Defendants regularly conduct and solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from goods and services provided to residents of this District and the State of Tennessee.

33.    Defendants are doing business, either directly or through respective agents, on an ongoing basis in this Judicial District and elsewhere in the United States and have committed acts of infringement in this district.

34.    On information and belief, Defendants make, use, sell, offer to sell, and/or import infringing products into and/or within this District, maintains a permanent and/or continuing presence within this District, and has the requisite minimum contacts with this District such that this venue is a fair and reasonable one.  Upon information and belief, Defendants have transacted and, at the time of the filing of the Complaint, are continuing to transact business within this District.

35.    Defendants purposefully direct or control the sale of the infringing products online and in nationwide retailers and wholesalers, including for sale in Tennessee and elsewhere in the

United States, and expects and intends that the infringing products will be so sold in this District. Defendants purposefully place the infringing products—whether by itself or through subsidiaries, affiliates, or third parties—into an international supply chain, knowing that the infringing products will be sold in the United States, including Tennessee and in this District. Therefore, Defendants also facilitate the sale of the infringing products in Tennessee.

36.     In particular, Defendants took active steps, directly and/or through contractual relationships with others, with the specific intent to cause such persons to import, sell, or offer to sell the infringing products in a manner that infringes the Asserted Patents. Such steps by Defendants included, among other things, making or selling the infringing products outside of the United States for importation into and/or sale in the United States, or knowing that such importation or sale would occur; and directing, facilitating, or influencing their affiliates, or third-party manufacturers, shippers, distributors, retailers, or other persons acting on its or its affiliates' behalf, to import, sell, and/or offer to sell the infringing products in an infringing manner.

37.     Defendants utilize established distribution channels to distribute, market, offer for sale, sell, service, and warrant infringing products directly to consumers and other users in the U.S., including providing links via its website to online stores, retailers, resellers, distributors, and solution partners offering such products and related services for sale. Such a presence furthers the development, design, manufacture, importation, distribution, sale, and use (including by inducement) of infringing products in Tennessee, including in this District. For example, Defendants design and manufacture products at Brother USA's Tennessee manufacturing facility, 7819 North Brother Boulevard, Bartlett, Tennessee, 38133, that are provided to customers in Tennessee and elsewhere. On information and belief, many of the exemplary infringing products

10

identified in this Complaint are manufactured and/or distributed in/from Brother USA's Tennessee manufacturing facility.

38.    Plaintiffs' causes of action arise, at least in part, from Defendants' contacts with and activities in and/or directed to this District and the State of Tennessee. This Court has personal jurisdiction over Defendants pursuant to Tenn. Code Ann. §20-2-223, the Tennessee Long Arm Statute.

39.    Venue is proper in this judicial District under 28 U.S.C. §§ 1391(b)-(c) because, among other things, Brother Industries is a foreign corporation. Defendant Brother Industries is not resident in the United States and thus may be sued in any judicial district pursuant to 28 U.S.C. § 1391(c)(3); *In re HTC Corp.*, 889 F.3d 1349 (Fed. Cir. 2018). Defendant Brother USA conducts substantial business in this forum, directly and/or through subsidiaries, agents, representatives, or intermediaries, including regularly doing or soliciting business, engaging in other persistent courses of conduct, or deriving substantial revenue from goods and services provided to individuals in Tennessee and in this judicial district.

40.    Brother is doing business, either directly or through respective agents, subsidiaries, or intermediaries, on an ongoing basis in this judicial District and elsewhere in the United States and have committed acts of infringement in this District.

41.    Brother is subject to this Court's jurisdiction pursuant to due process and the Tennessee Long Arm Statute due at least to its substantial business activities in this State and District, including (a) its past and present infringing activities, (b) regularly doing or soliciting business in Tennessee, and/or (c) engaging in persistent conduct and/or deriving substantial revenue from goods or services, including hardware, software, or support related goods or services, provided to customers in Tennessee.

11

## FIRST CLAIM

### (Infringement of the '323 Patent)

42.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1-41 of their Complaint.

43.     The '323 Patent is generally directed to generating a cryptographic key used to secure a communication link between a first device and a second device.

44.     The claims of the '323 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

45.     BlackBerry developed the technology in the '323 Patent to solve several technical problems associated with securing wireless communications. At the time of the invention, wireless communication was generally "insecure and vulnerable to attacks." Exhibit 1 at 1:6-7. Various techniques were "employed to secure a wireless communication link or to make it less vulnerable to attacks," including, for example, conventional "cryptographic techniques" including conventional "symmetric-key systems (also known as "secret-key systems"), a single, common cryptographic key is stored by two communication devices." In these prior art "public-key systems (also known as "public-private pair systems"), each communication device stores its own private key and freely distributes its own public key." *Id.* at 1:7-16. The inventors recognized, however, that within these conventional cryptographic techniques "[v]arious security concerns exist[ed] … For example, secrets need to be shared between the two communication devices in a secure and authenticated manner. Especially in the case of mobile devices, it may be desirable to have only those two devices know the secret and not require the intervention/involvement of an Information Technology (IT) administrator. Also, it may be desirable to verify that the devices share a secret

12

without exposing that secret to others, and to use the secret to generate a key to secure a communication link between the devices." *Id.* at 1:17-26.

46.     The '323 Patent solved these problems by requiring the two communication devices to establish "the symmetric key used to secure communications over a communication link". *Id*. at 3:11-15.   In one example, a key is created over a communication link by the devices "each hash[ing] all the packets sent and received during the generation of symmetric keys K1 and K2 to produce the hash result H.  For example, the selected hash function may be applied to the packets as the packets are sent and received, so that this is concurrent with generating the symmetric keys K1 and K2." *Id*. at 4:9-14. The two communication devices "each generate the same symmetric key K3 from K1, K2 and the hash result H. *Id*. at 4:21-26.  Symmetric key K3 may then be used to secure communications over communication link 106." *Id*. at 4:2-26.  Using the symmetric key used to secure communications over a communication link, allows for secure communication between the devices without any intervention or involvement of an intermediary. *See e.g., id.* at 1:20-23, 3:16-52; 4:18-26.

47.     Defendants have been on notice of the '323 Patent and a specific factual basis for its infringement of the '323 Patent since at least October 16, 2025.

48.     Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '323 Patent, by making, using, testing, selling, leasing, licensing, offering for sale, and/or importing hardware and/or software such as Defendants' products including Brother PJ-883 and HL-L3280CDW.  An exemplary claim chart showing one way in which Defendants infringed claim 1 of the '323 Patent is attached as Exhibit 5.

13

49. Defendants also indirectly infringed, and continue to indirectly infringe, the '323 Patent under 35 U.S.C. § 271(b) and (c).

50. Defendants knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe, and continue to do so, at least claim 1 of the '323 Patent by, for example, having sold, offered for sale, and encouraged customers to use at least some or all of the infringing products. Defendants, for example, instruct on how to securely communicate document data and how to enable TLS 1.3 on its printers.

*See* https://support.brother.com/g/b/spec.aspx?c=us&lang=en&prod=pj883eus; *see also* Exhibit 5.

51. Defendants contributed to, and continue to contribute to, the direct infringement of at least claim 1 of the '323 Patent under 35 U.S.C. § 271(c) by, for example, supplying, with knowledge of the '323 Patent, a material part of a claimed invention, where the material part was not a staple article of commerce and was incapable of substantial non-infringing use. For example, Defendants provide, own, operate, sell, offer to sell, lease, and/or import infringing wireless connectivity in Defendants' products (such as shown in Exhibit 5) that are not a staple article of commerce and are incapable of substantial infringing use.

52. Defendants' infringement is willful in view of the above and their failure to take any action, even after being put on notice, to stop their infringement or inducement of, or contribution to, infringement by others.

## **SECOND CLAIM**

### **(Infringement of the '934 Patent)**

53. Plaintiffs re-allege and incorporate herein by reference paragraphs 1-52 of their Complaint.

14

54.    The '934 Patent is generally directed to selecting a low-density parity-check (LDPC) code used for encoding variable sized data. The claims of the '934 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

55.    The '934 Patent includes improvements to an existing technological process (e.g., selecting an LDPC code) and improvements to the performance of a computer system itself (e.g., a wireless communication system). For example, the specification discloses: "[o]ne problem when using LDPC codes is a necessity to properly adjust the encoding procedure due to variable payload size and due to variable underlying transmission mechanism. Such encoding procedure typically assumes usage of shortening and puncturing techniques. Furthermore, there may be a plurality of LDPC codes with different codeword lengths and code rates available. The number of the possible combinations may present a challenge to select the appropriate LDPC code to provide a suitable coding gain, and at the same time minimize the number of encoded packets, codewords and modulated symbols." Exhibit 2 ('934 Patent) at 1:66-2:9. The '934 addressed these problems through improvements in selecting an LDPC code for variable sized data as disclosed in at least claim 1: "[a] method for selecting a low-density parity-check (LDPC) code used for encoding variable sized data…. encoding data using the selected LDPC code."

56.    The patent teaches another example of an improvement in selecting an LDPC code for variable sized data: "these [known] methods do not directly address the problem described earlier: apply shortening and puncturing in such a way that the code rate is approximately the same as the original one, and the coding gain is preserved. One method attempting to solve this problem specifies shortening and puncturing such that the code rate of the original code is preserved." *Id*. at 7:17-23. The specification discloses how the ordered combination of calculating a number of shortening bits and a number of puncturing bits when selecting an LDPC code provides a

15

significant improvement to the performance of the wireless communication system at the time of the invention. For example, the specification discloses the advantages of shortening "[i]n the case of a column regular parity check matrix, or more generally, approximately regular or regular and approximately regular only in the data part of the matrix, H, the method described in the previous paragraph is still preferred compared to the existing random or periodic/random approach. The method described here ensures approximately constant row weight, which is another advantage from the performance and the implementation complexity standpoint." *Id*. at 9:57-59. Improvements in selecting an LDPC code using shortening are disclosed in at least claim 1: "calculating a number of shortening $N_{shortened}$ bits for each of the plurality of LDPC codes; … determining, in a computer processor, a selected LDPC code from the plurality of shortened LDPC codes," dependent claim 3: "herein the performance criterion is selected from the group consisting of … a range of $N_{shortened}$," dependent claim 4: "wherein the performance criterion is selected from the group consisting of… a maximum for $N_{shortened}$."

57.    Another example of the advantages of the ordered combination of calculating a number of shortening bits and a number of puncturing bits when selecting an LDPC code is disclosed in *Id*. at 10:61-11:1, with reference to the performance curves of Fig. 9: "[a]mong all of those [performance curves], it appears that for the particular matrix structure (irregular $H_d$ part with the modified dual diagonal in the $H_p$ part) the best results are obtained when both criteria [shortened bits and punctured bits] are taken into account, as represented by curves 242, 243, 245, 246. Among all of those, it appears that for the particular matrix structure (irregular $H_d$ part with the modified dual diagonal in the $H_p$ part) the best results were obtained when the punctured bits were selected from those corresponding to the weak columns of the data part of the parity check matrix, $H_d$." Improvements in selecting an LDPC code using puncturing are disclosed in at least claim 1:

16

"calculating a number of puncturing $N_{punctured}$ bits for each of the plurality of LDPC codes; … determining, in a computer processor, a selected LDPC code from the plurality of shortened LDPC codes and the plurality of punctured LDPC codes meeting the performance criterion," dependent claim 3: "wherein the performance criterion is selected from the group consisting of … a range of $N_{punctured}$," dependent claim 4: "wherein the performance criterion is selected from the group consisting of… a minimum for $N_{punctured}$,"

58.     Another example of the advantages of the ordered combination of calculating a number of shortening bits and a number of puncturing bits when selecting an LDPC code is based on a ratio of shortening to puncturing bits. For example, "the shortening-to-puncturing ratio can be chosen such that it guarantees preservation of the performance level of the original code." *Id*. at 11:11-13. Further, the specification discloses that a normalized shortening to puncturing ratio, $q_{normalized}$ can be used to reduce complexity and preserve performance "if the goal is to preserve performance, this normalized ratio must be greater than one: $q_{normalized}>1$. It was found through much experimentation that $q_{normalized}$ in the range of 1.2-1.5 complies with the performance preserving requirements." *Id*. at 11:19-23. Improvements in selecting an LDPC code based on a shortening-to-puncturing ratio are disclosed in at least claim 1: "determining, in a computer processor, a selected LDPC code from the plurality of shortened LDPC codes and the plurality of punctured LDPC codes meeting the performance criterion," dependent claim 3: "wherein the performance criterion is selected from the group consisting of…. a range for normalized shortening to puncturing ratio, $q_{normalized}$," and dependent claim 4: "wherein the performance criterion is selected from the group consisting of… a maximum for normalized shortening to puncturing ratio, $q_{normalized}$."

59.     Another example of the significant improvement to LDPC coding methods claimed by the invention is the use of an ordered combination of claim elements to meet a performance criteria "[t]he LDPC codes with different lengths and code rates generally result in a plurality of possible coding options, from which a coding option may be chosen based on the criteria as described above, namely: (a) Keep the performance i.e. the coding gain as high as possible; (b) Use as few modulated symbols as possible; and (c) Keep the overall complexity at a reasonable level." *Id*. at 12:26-34.  Criteria (a) "the coding gain as high as possible" results in the improvement of reducing the bit error rate in the wireless communication thereby increasing its efficiency and performance. Criteria (b) results in an improvement in reduced transmit power and increased bandwidth (more bits per second). Criteria (c) results in reduced CPU cycles thereby reducing network latency and increasing battery life. The selection of the performance criteria is based on one or more parameters as recited in claim 3: "wherein the performance criterion is selected from the group consisting of a range of effective coding rates, a range of basic coding rates, a range of numbers of transmission symbols, a range of $N_{punctured}$, a range of $N_{shortened}$, a range of parity bits in LDPC codewords, a range for normalized shortening to puncturing ratio, $q_{normalized}$, and a combination thereof," and claim 4: "wherein the performance criterion is selected from the group consisting of a minimum effective coding rate, a minimum basic coding rate, a minimum number of transmission symbols, a minimum for $N_{punctured}$, a maximum for $N_{shortened}$, a maximum number of parity bits in LDPC codewords, a maximum for normalized shortening to puncturing ratio, $q_{normalized}$, and a combination thereof."

60.     Defendants have been on notice of the '934 Patent and a specific factual basis for its infringement of the '934 Patent since at least September 8, 2025.

61.     Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '934 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software including devices compliant with IEEE 802.11 standards (excluding any products licensed under the '934 Patent), such as any of Defendants' product implementing LDPC, such as Brother Printer HL-3170CDW, Brother Printer HL-L3280CDW, and Brother Printer MFC-L5915DW, as identified in Exhibit 6.  An exemplary claim chart showing one way in which Defendants infringe claim 1 of the '934 Patent is attached as Exhibit 6.

62.     Defendants have also indirectly infringed, and continue to indirectly infringe, the '934 Patent under 35 U.S.C. § 271(b) and (c).

63.     Defendants have knowingly, intentionally actively aided, abetted, and induced others to directly infringe at least claim 1 of the '934 Patent, and continue to do so, by, for example, selling and offering access to devices compliant with IEEE 802.11 standards. Defendants knowingly, intentionally, and actively aid, abet, and induce others to directly infringe at least claim 1 of the '934 Patent by, for example, selling, offering for sale, and encouraging customers to use at least some or all of the infringing products. Defendant for example, provides instructions on how to access and use the infringing Wi-Fi features. *See* https://support.brother.com/g/b/faqend.aspx?c=us&lang=en&prod=hl3170cdw_all&faqid=faq00 100429_011#:~:text=To%20set%20up%20your%20Brother%20HL%2D3170CDW%20on,displ ay%20a%20list%20of%20available%20network%20names..html; *see also* Exhibit 6.

64.     Defendants also contributed to the direct infringement of at least claim 1 of the '934 Patent under 35 U.S.C. § 271(c), and continues to do so, by, for example, supplying, with

knowledge of the '934 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial noninfringing use. For example, Defendant provides, owns, operates, sells, offers to sell, and/or imports devices compliant with IEEE 802.11 standards (such as that shown in Exhibit 6) that are not a staple article of commerce and are incapable of substantial non-infringing use.

65.    Defendants' ongoing infringement is willful in view of the above and their failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

## THIRD CLAIM

### (Infringement of the '847 Patent)

66.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1-65 of their Complaint.

67.    The '847 Patent is generally directed to providing user interface control of a touchscreen device.

68.    The claims of the '847 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

69.    BlackBerry developed the technology in the '847 Patent to solve several technical problems associated with wireless communications. At the time of the invention, conventional devices had "an interface to facilitate interaction with the various functions that it offers. The interface may include a hardwired interface and/or a virtual interface. Hardwired interfaces may include pushbutton switches, rotary switches/potentiometers, sliders, and other mechanical elements."  In contrast, "[v]irtual interfaces may include virtual buttons, virtual sliders, virtual rotator controls, function identifiers, and other visual elements. In a combined interface, function

20

identifiers may be positioned on a display adjacent corresponding mechanical based items, such as switches." With the arrival of virtual interfaces, displays became "complicated when the interface displays controls and/or images associated with many functions. The number of controls and/or images generated may result in a crowded display." As a result, conventional system displays encountered problems with the crowded displays, including difficulties "for the user to select displayed objects associated with these functions due to their close proximity with one another." Exhibit 3 at 1:25-41.

70.    The '847 Patent solved these problems by providing an interface application which identifies gesture and selection functions on an interface (e.g., a crowded display) and differentiating between the selection of objects on the interface. For example, the interface application "may control the touchscreen display to provide a container and a user interface control that is selectable by a user. The user interface control may be selected through manipulation of the touchscreen display in an area of the container proximate the user interface control. The user interface application may identify a gesture function in response to manipulation of the touchscreen display in an area of the container when the manipulation has a motion magnitude in a plane of the touchscreen display exceeding a threshold value." *Id*. at 1:45-55. Further, the '847 Patent teaches identifying and differentiating between the touch-based selection of objects on a crowded display. For example, the 847 Patent teaches that "[i]f the magnitude of the motion does not extend beyond the threshold value, an operation may be executed at 625 to determine whether the manipulation was proximate [to] an active area of a selectable object. If it was in such an active area, the function associated with the object selection may be identified at 630 and executed at 635." *Id*. at 4:1-6.

71.     Defendants have been on notice of the '847 Patent and a specific factual basis for its infringement of the '847 Patent at least since the filing of this Complaint.

72.     Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 14 of the '847 Patent, by making, using, testing, selling, leasing, licensing, offering for sale, and/or importing hardware and/or software such as Defendant's products including: MFC-L2820DW, MFC-L2820DWXL, MFC-L2807DW, MFC-L2760DW, HL-L2480DW, DCP-L2640DW, HL-L2465DW, HL, L2460DWXL, HL-L2460DW, HL-L2405W, HL-L2420DW, HL-L2400D.  An exemplary claim chart showing one way in which Defendant infringed claim 14 of the '847 Patent is attached as Exhibit 7.

73.     Defendants also indirectly infringe, and continue to indirectly infringe, the '847 Patent under 35 U.S.C. § 271(b) and (c).

74.     Defendant knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe at least claim 14 of the '847 Patent, and continues to do so, by, for example, selling, offering for sale, and encouraging others to use the infringing products.  Defendants, for example, instruct users on how to securely communicate document data and use the touchscreen on its products.  *See* https://support.brother.com/g/s/id/htmldoc/mfc/cv_dcpl2508dw/use/html/ GUID-3DAD29E3-DF24-4518-AEEF-FCB00950C9A0_1.html?c=us&lang=en&prod= mfcl2820dw_us_as&broug=in; *see also* Exhibit 7.

75.     Defendants contributed to, and continue to contribute to, the direct infringement of at least claim 14 of the '847 Patent under 35 U.S.C. § 271(c) by, for example, supplying, with knowledge of the '847 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial non-infringing use.  For example,

22

Defendants provide, own, operate, sell, offer to sell, lease, and/or import infringing wireless connectivity in the Defendants' Products (such as shown in Exhibit 7) that are not a staple article of commerce and are incapable of substantial infringing use.

76.     Defendants' infringement is willful in view of the above and their failure to take any action, even after being put on notice, to stop their infringement or inducement of, or contribution to, infringement by others.

## FOURTH CLAIM

### (Infringement of the '316 Patent)

77.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1-76 of their Complaint.

78.     The '316 Patent is generally directed to allowing mobile devices to communicate with a peer-to-peer (P2P) network prior to negotiating which device will become group owner of that P2P network.

79.     The claims of the '316 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

80.     BlackBerry developed the technology in the '316 Patent to solve several technical problems associated with wireless communications. For example, the inventors of the '316 Patent recognized that "Peer-to-peer ("P2P") networks allow connectivity between individual devices. In one example, a P2P network may be referred to as a group and include a group owner (GO) that is the master device for the group that may manage signaling, timing, clock synchronization, etc., and establish certain group settings (e.g., the group may be set as a persistent group or a non-persistent group)."  Exhibit 4 at 1:23-29.  Non-persistent and persistent groups are important to P2P networks because "[a] non-persistent group only lasts (i.e., remains intact as a group) as long

as a device is in communication range of the group and other devices within the group. A non-persistent group treats a device that wants to re-join as if the device is a new device joining the group for the first time. In contrast, a persistent group is a group in which the group owner and/or other devices within the group are able to store persistent information related to the group. In other words, the term 'persistence' when used in reference to a persistent or a non-persistent group implies the ability (or lack of ability) of a group owner and/or group member to store information associated with that group as well as information associated with the devices that join the group. Therefore, information for joining the group may persist (i.e., remain stored) within a device for a persistent group." *Id*. at 1:29-44.  At the time of the invention, conventional systems did not allow for determining whether a P2P group is persistent or non-persistent before formation of the P2P group.  As such, in conventional systems, when a device did not prefer to join a non-persistent group, there was no way for that device to know whether the group was non-persistent prior to the formation of the group and so, "the subsequent departure of that device" would result in "wasted signaling and battery consumption." *Id*. at13:50-51.

81.    The '316 Patent solved these problems by allowing "mobile devices or wireless devices to communicate with a peer-to-peer (P2P) network or group prior to negotiating which device will become group owner ("group owner negotiation") of that P2P network. The communications prior to group owner negotiation may include information about whether the P2P network or group is persistent or non-persistent. The information may include a persistent group intent field that identifies whether a device would prefer to join a persistent P2P network or group and allows a P2P network or group to advertise whether the P2P network or group is persistent. … *Id*. at 2:10-20.  In particular, "the wireless device and a group (or a group owner) may communicate prior to the wireless device joining the group. … A persistent group intent (PGI) field may be

communicated prior to a device joining a particular group." *Id.* at 23-24, 30-32.  This way, the Group Owner of the P2P group avoids "storing credentials for devices which do not wish to use persistence (and may therefore discard the group credentials on leaving the group). Similarly, it may avoid the creation (or joining) of a group which does/does-not use persistence in contradiction to a member device's desire/policy and the subsequent departure of that device, resulting in wasted signaling and battery consumption." *Id.* at 13:44-51.

82.    Defendants have been on notice of the '316 Patent and a specific factual basis for its infringement of the '316 Patent since at least April 12, 2024.

83.    Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '316 Patent, by making, using, testing, selling, leasing, licensing, offering for sale, and/or importing hardware and/or software such as Defendants' products including Brother Printers HL-3170CDW, HL-L3280CDW, and MFC-L5915DW.  An exemplary claim chart showing one way in which Defendant infringed claim 1 of the '316 Patent is attached as Exhibit 8.

84.    Defendants also indirectly infringe, and continue to indirectly infringe, the '316 Patent under 35 U.S.C. § 271(b) and (c).

85.    Defendant knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe at least claim 1 of the '316 Patent, and continues to do so, by, for example, selling, offering for sale, and encouraging customers to use at least some or all of the infringing products.  Defendants, for example, instruct users on how to securely communicate document data, and enable Wi-Fi Direct on its printers.  *See* https://support.brother.com/g/b/spec.aspx?c= us&lang=en&prod=pj883eus; *see also* Exhibit 8.

25

86.    Defendants contributed to, and continue to contribute to, the direct infringement of at least claim 1 of the '316 Patent under 35 U.S.C. § 271(c) by, for example, supplying, with knowledge of the '316 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial non-infringing use.  For example, Defendants provide, own, operate, sell, offer to sell, lease, and/or import infringing wireless connectivity in the Defendants' Products (such as shown in Exhibit 8) that are not a staple article of commerce and are incapable of substantial infringing use.

87.    Defendants' infringement is willful in view of the above and their failure to take any action, even after being put on notice, to stop their infringement or inducement of, or contribution to, infringement by others.

## PRAYER FOR RELIEF

WHEREFORE, Malikie and KPI pray for judgment against Brother as follows:

88.    That Brother has infringed each of the Asserted Patents will continue to infringe the Asserted Patents unless enjoined;

A.    That Brother's infringement of the 'Asserted Patents patent has been, and continues to be, willful;

B.    That Brother pay Malikie and KPI damages adequate to compensate for its past, present, and future infringement of each of the Asserted Patents, together with interest and costs under 35 U.S.C. § 284;

C.    That Brother pay prejudgment and post-judgment interest on the damages assessed;

D.    That Brother pay Malikie and KPI enhanced damages pursuant to 35 U.S.C. § 284;

E.    That Brother be ordered to pay ongoing royalties to Malikie and KPI for any post-judgment infringement of the 'Asserted Patents;

F.     That this is an exceptional case under 35 U.S.C. § 285; and that Brother pay Malikie and KPI's attorneys' fees and costs in this action; and

G.     That Malikie and KPI be awarded such other and further relief, including equitable relief, as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Malikie and KPI hereby demands a trial by jury on all issues triable to a jury.

Respectfully submitted,

*/s/ Jimmie C. Miller*
Jimmie C. Miller (BPR No. 009756)
Caroline R. Williams (BPR No. 029454)
HUNTER SMITH & DAVIS LLP
1212 North Eastman Road
P.O. Box 3740
Kingsport, TN 37664
(423) 378-8800; Fax: (423) 378-8801

*OF COUNSEL – PRO HAC VICE TO BE FILED*

Khue V. Hoang
Reichman Jorgensen Lehman & Feldberg LLP
650 Fifth Avenue, Suite 2320
New York, NY 10019
Tel: (212) 381-1965
khoang@reichmanjorgensen.com

Matthew G. Berkowitz
Reichman Jorgensen Lehman & Feldberg LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel: (650) 623-1401
mberkowitz@reichmanjorgensen.com

Naveed Hasan
Reichman Jorgensen Lehman & Feldberg LLP
1909 K Street, NW, Suite 800

Washington, DC 20006
Tel: (202) 894-7310
nhasan@reichmanjorgensen.com

*Attorneys for Plaintiffs Malikie Innovations Ltd.
and Key Patent Innovations Ltd.*

28